IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DAVID SHAW, | ) |
| Plaintiff, | ) ) ) |
| v. | ) NO. 3:13-cv-1195 |
| | ) JUDGE CAMPBELL |
| KENAN TRANSPORT, LLC, | ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

Plaintiff David Shaw filed this action in October 2013 asserting a single count of age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C.A. § 623. Now before the Court is Defendant's motion for summary judgment. (Docket No. 33). jaFor the reasons set forth herein, the Court will grant Defendant's motion.

**I.     FACTUAL BACKGROUND**

The facts set forth herein are undisputed for purposes of the defendant's motion, unless otherwise indicated.

The Kenan Advantage Group, Inc. ("Kenan")[1] is a network of trucking and trucking logistics entities, with locations throughout the United States. David Shaw began working for Kenan in 2002 as a truck driver, when his previous employer was acquired by Kenan. In 2004, Shaw was promoted to Regional Safety and Security Manager, a position that entailed enforcing safe operating practices and ensuring compliance with Kenan's rules and policies throughout his region, which included the states of Alabama, Mississippi, Tennessee, and part of Kentucky. In 2008, Gordon Brewer became Shaw's supervisor. In June 2011, Brewer was promoted, and Mark Follett became Shaw's direct

---

[1]Plaintiff's Complaint incorrectly identifies Defendant as Kenan Transport, LLC.

supervisor. From June 2011 until the time of Shaw's termination in June 2012, Shaw reported to Follett, and Follett reported to Brewer.

Soon after becoming Shaw's supervisor in 2008, Brewer developed concerns about Shaw's performance, including concerns about Shaw's lack of organizational skills. As a result, he arranged for Shaw to attend a training, at Kenan's expense, to try to assist him with improving those skills. Brewer did not feel that the training succeeded in improving Shaw's skills. As a result, Brewer removed some territories from Shaw's region. Shaw testified that he was not told why his territory was being reduced. Brewer also felt that Shaw's communication skills were poor, and he had several counseling sessions with Shaw about these issues throughout 2010 and for the first half of 2011. Shaw disputes that he had problems with communication skills, but admits that Brewer alleged this and counseled him on those issues.

On December 16, 2010, Brewer met with Shaw to discuss his performance, and provided several examples of recent behavior that Brewer found unacceptable, including Shaw's failure to call after a Department of Transportation recordable accident, failure to respond to an e-mail from Kenan's Executive Vice President of Safety, failure to notify Brewer when he was out sick, and failure to notify Brewer that he was leaving one destination for another when he had been asked to be available for coverage in another region. On January 12, 2011, feeling that Shaw had failed to address these issues and problems, Brewer met with Shaw at Kenan's corporate offices in Ohio and gave him a written final warning. Shaw refused to sign the warning based on his understanding that the company procedure was to give a written warning, a verbal warning, and then a final warning. Shaw denies receiving written or verbal warnings before receiving the final warning. Shaw did not allege during this time period that he was being discriminated against on the basis of his age. Shaw denies that his performance was problematic, but admits that Brewer took these actions. When asked

to rate his own performance at Kenan on a scale of one to five, with five being the best performance, Shaw rated himself a 3.5, or 77%. (Shaw Dep. (Docket No. 38-1), 24:6–13)).

When Follett became Shaw's supervisor in June 2011, he too perceived Shaw to be disorganized and difficult to contact, and he sent Shaw a series of e-mail messages addressing his concerns that Shaw was generally unresponsive, submitted required reports late, and failed to follow up on issues. Shaw does not deny that Follett sent e-mails on these topics. In Shaw's September 2011 annual performance review, Follett outlined areas in which Shaw needed to improve and rated Shaw's overall performance as being below expectations. In that review, Follett stated that Shaw was unable to submit expected analyses for incidents and accidents, that he failed to submit safety audits in a timely fashion and without errors, that he had problems with decision-making and dependability, and that his work output in a week's time was minimal. Because of this unfavorable performance review, Follett placed Shaw on a performance improvement plan, instructing Shaw to improve his work quality and quantity and also his decision-making skills. Again, Shaw disputes that his performance was low or that he needed to be placed on a performance improvement plan, but he does not dispute that these were the communications between him and Follett. Follett gave Shaw specific and detailed instructions as to how he could improve his job performance. Shaw did not suggest at that time that Follett was motivated by Shaw's age. Follett did not feel Shaw's performance improved.

Around October 5, 2011, drivers who had been at a safety meeting led by Shaw a few weeks earlier in Knoxville, Tennessee, told Follett that Shaw had made inappropriate comments at the meeting indicating his disregard for Kenan's leadership as well as his feelings that Kenan paid its drivers poorly and had used poor judgment in its acquisitions. On October 6, 2011, Follett and Brewer met with Shaw to discuss these statements Shaw allegedly made at the Knoxville meeting.

3

During this meeting, Shaw said that he had no recollection of making those types of comments at the Knoxville drivers' meeting. (Shaw Dep. 67:1–4). Shaw testified that, as of the date of his deposition, he had no recollection of what he had said at the Knoxville meeting. He testified that his recollection had been refreshed by a subsequent conversation with one of the drivers present at the meeting, who told Shaw that Shaw had not made any of those kinds of statements. (Shaw Dep. 67:5–24). Shaw testified that he has a bad memory. (Shaw Dep. 68:15). Shaw later sent a letter to Follett stating that he had not made the statements at the Knoxville meeting that Follett and Brewer alleged.

On October 20, 2011, based on these allegedly inappropriate comments at the Knoxville meeting and allegedly ongoing poor performance, Follett and Brewer met with Shaw. At that meeting, Follett gave Shaw another "final warning." Follett asked Shaw to stay home for three days, think about whether he wanted to continue to work for Kenan, and, if he did, to write a letter committing to improve in eight specified areas that had been the subject of Shaw's earlier performance problems. During this meeting, Shaw believes that Brewer told him that he only had seven or eight years left to work for Kenan. Brewer testified that he said, "*we* only have seven or eight years left to work for Kenan," including himself in the statement. At the time of this meeting, Brewer was fifty-six years old, and one year younger than Shaw. Brewer testified that, by making this statement, he was trying to encourage Shaw to improve his performance by indicating that both he and Shaw could work at Kenan for several more years if Shaw could improve his performance issues. Shaw believes this statement was evidence of Brewer's animus toward Shaw's age. Shaw did not raise a concern of age discrimination to anyone at Kenan at that time. On October 24, 2011, Shaw submitted the requested "commitment letter" to Follett.

Between the October 24, 2011 commitment letter that Shaw wrote and Follett's termination of Shaw's employment in June 2012, Follett documented approximately thirty occasions of what he considered to be Shaw's unsatisfactory performance. Each of these was communicated by e-mail from Follett to Shaw, and Follett testified that he also spoke to Shaw about most of them as well. Shaw does not dispute that Follett documented these alleged performance problems, but argues that his motivation was pretextual and controlled by Brewer, who had animus against him because of his age, as demonstrated by the "seven-or-eight-years-left-to-work" comment. When asked in deposition about twenty-seven of the identified criticisms, Shaw testified that he could not recall seven of them, that six of the criticisms were "justified," that three of the criticisms were "partially justified," and that the remaining eleven criticisms were unfair. Shaw acknowledged in his deposition that none of these criticisms concerned or involved his age, that Follett never discriminated against him, and that he and Follett had what he called "a good-faith disagreement" about how to properly perform his job.

In early May 2012, Follett discovered that two drivers under Shaw's authority had failed to attend safety school and that Shaw had failed to follow up with the drivers or with management about this failure. Follett also learned that, although Shaw had agreed to improve in monitoring reports that track driver speeding, he had failed to review those documents and report speeding issues to Follett. Follett considered these to be serious violations of Shaw's responsibilities. Follett testified that on May 3, 2012, he decided to terminate Shaw's employment based on what he perceived to be Shaw's ongoing performance problems and concerns that Shaw's failure to manage the drivers presented serious safety risks. Shaw maintains that Follett's criticisms were not all valid. Follett wrote up a complete history of Shaw's performance issues and the opportunities Kenan had given him to improve his performance. Follett received approval from Brewer, as his supervisor, and

also from Kenan's Human Resources Department, as required by Kenan's policies and practices. On June 11, 2012, Follett terminated Shaw's employment. Shaw was 57 years of age at the time of his termination. Brewer was 56 years old, and Follett was 50 years old, at the time of Shaw's termination.

On January 23, 2013, Shaw filed a charge of discrimination with the Tennessee Human Rights Commission and also with the Equal Employment Opportunity Commission ("EEOC"). In his charge, Shaw alleged that he received two Final Warnings in 2011 and that those warnings were based on his age. Kenan submitted a position statement denying those allegations. On July 30, 2013, Shaw received a right to sue letter from the EEOC.

## II. STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "'inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of plaintiff's position[, however,] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at

249–52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247–49).

## III. LEGAL ANALYSIS

Defendant has moved for summary judgment, asserting that it is entitled to judgment as a matter of law in its favor on Plaintiff's ADEA discrimination claim.

### A. Legal Standards

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may establish a *prima facie* claim of employment discrimination under the ADEA based upon direct or indirect, circumstantial evidence. Where only indirect evidence of discrimination is available, the claims are analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas* and its progeny, the plaintiff must first make out a *prima facie* case of discrimination by showing: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). If the plaintiff presents facts which, if true, would prove each of these elements, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the termination. *McDonnell Douglas Corp.*, 411 U.S. at 802. "If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." *Blizzard*, 698 F.3d at 283 (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003)).

However, the *McDonnell Douglas* evidentiary framework is inapplicable where the plaintiff presents direct evidence of discrimination. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination . . . . The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff has his day in court despite the unavailability of direct evidence.'"); *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (noting that *Gross* did not alter the application of the *McDonnell Douglas* evidentiary framework to prove ADEA claims based on circumstantial evidence).

Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (direct evidence is "evidence from the lips of the defendant proclaiming his or her [discriminatory] animus" (citations and quotation marks omitted)). The Sixth Circuit has recognized that it is only in the "rare" case that a plaintiff will have direct evidence that the adverse employment action taken against her was motivated by discrimination. *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998); *Kline v. Tenn. Valley Auth*, 128 F.3d 337, 348 (6th Cir. 1997). The direct evidence upon which a plaintiff seeks to rely must establish not only that a defendant was predisposed to discriminate on the basis of a protected characteristic, but also that the defendant acted on that predisposition in taking the adverse employment action in question. *DiCarlo v. Potter*, 358 F.2d 408, 415 (6th Cir. 2004), *abrogated in part on other grounds by Gross*, 557 U.S. at 177. To qualify as evidence of action on a discriminatory predisposition, there must be some nexus between the alleged statements and the subsequent adverse employment action. *Id.* at 416–17.

Whether the plaintiff presents direct or only indirect evidence, the burden of persuasion

remains at all times on the plaintiff.

B.   **Direct Evidence of Discrimination**

To prove an ADEA claim with direct evidence, the evidence must be sufficient to establish that "age was the 'but-for' cause of the employer's adverse action." *Gross*, 557 U.S. at 177. Thus, "[t]o prevail on direct evidence at the summary judgment stage . . . plaintiffs must prove by a preponderance of the evidence that age was the 'but-for' cause of the challenged employer decision." *Sharp v. Aker Plant Servs. Grp.*, 726 F.3d 789, 798 (6th Cir. 2013) (internal quotation marks, brackets, and ellipsis omitted); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. ----, 133 S. Ct. 2517, 2527 (2013) (holding that for an employer to take an adverse action "because of age" means "'that age was the "reason" that the employer decided to act.'" (quoting *Gross*, 557 U.S. at 176)).

Shaw testified that Follett never discriminated against him and that Brewer's comment that Shaw had "seven or eight years left" is his only evidence of age discrimination. Although Shaw's brief in response to Kenan's motion for summary judgment contains the heading "Plaintiff Can Establish His Case Through Direct Evidence," he concedes in that section that Brewer's statement is insufficient to constitute direct evidence of discrimination. (Docket No. 42, at 12 (Pl.'s Brief).

C.   **Applying the *McDonnell Douglas* Framework**

Plaintiff cannot make out a *prima facie* case of discrimination. He is a member of a protected group, as he was over forty years of age when he was terminated from his employment. His termination constitutes an adverse employment action. As to his qualifications for the job in question, the Sixth Circuit has "repeatedly cautioned district courts against 'considering the employer's alleged nondiscriminatory reason when analyzing the *prima facie* case.'" *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (quoting *Wexler v. White's Fine*

9

*Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir.2003) (en banc)) (internal brackets omitted). That is, courts must not "conflat[e] . . . the qualification prong with the [employer's] proffered reason for terminating" an employee. *Id.* To consider the employer's proffered reason for termination at the *prima facie* stage would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the alleged nondiscriminatory reason was actually a pretext for discrimination. *Wexler*, 317 F.3d at 574. When assessing whether a plaintiff is qualified at the *prima facie* stage, a court must examine the plaintiff's evidence *independent* of the nondiscriminatory reason produced by the defense as its reason for the adverse employment action. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2003). "[A] plaintiff can satisfy the qualification prong by showing that she performed at a level that generally met her employer's objective minimum qualifications." *Loyd*, 766 F.3d at 590 (quoting *Wexler*, 317 F.3d at 575–76).

Although it is unclear what evidence Shaw has to satisfy the qualification prong, even assuming he could prove that he was qualified for his job, he has no evidence of circumstances that would support an inference that his termination was based on age discrimination— the last element of the *prima facie* case. The only circumstance Shaw claims supports such an inference is the comment that Brewer made approximately eight months before his termination that Shaw had seven or eight years left to work at Kenan. Brewer's comment about the timing of Shaw's retirement does not constitute evidence of age bias, which presumably is why Plaintiff concedes that he does not have direct evidence of age discrimination. "The Supreme Court has taught that an aspect of employment that could correspond to age, such as years in service, could be a legitimate basis to distinguish among employees for employment privileges and benefits, say in the area of pensions, as long as the other feature is 'analytically distinct' from age." *Sharp v. Aker Plant Services Group*, 726 F.3d 789, (6th Cir. 2013) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993)). The

Sixth Circuit has, in keeping with *Hazen Paper*, refused to infer age bias from an employer's inquiries into an employee's retirement plans. *Woythal v. Tex-Tenn Corp.*, 12 F.3d 243, 247 (6th Cir. 1997); *see also Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992).

In addition, the lapse in time between Brewer's statement, the ongoing, and well-documented problems with Shaw's performance, and the multiple opportunities Shaw was given to improve his performance, all mitigate against any inference that Shaw's termination was based on age discrimination. There is not enough evidence from which a reasonable jury could conclude that Kenan terminated Shaw because of his age.

Furthermore, even if Shaw could make a *prima facie* case of age discrimination, Kenan has posited legitimate, non-discriminatory reasons for terminating Shaw--- namely, that his supervisors found him to have serious and ongoing performance issues. Over a several year period, Shaw's various supervisors documented a large number of performance problems, made extensive efforts to try to help Shaw improve his performance, and perceived that, despite these efforts, Shaw continued not to perform up to his employer's expectations. Follett testified that at the time he decided to terminate Shaw, he believed that Shaw's continuation in his position with Kenan posed a safety hazard. It was Kenan's business judgment that Shaw was unfit for his position. Shaw has not met his burden of production to demonstrate that the proffered reason is a pretext.

**IV. CONCLUSION**

As Shaw himself concedes, Brewer's statement about the number of years Shaw had left to work for Kenan is not sufficient to constitute direct evidence of age discrimination. Shaw's evidence is also insufficient under the *McDonnell Douglas* analysis. Kenan is entitled to judgment on Shaw's ADEA discrimination claim. Accordingly, the Court will enter judgment for Kenan on this claim, which is Shaw's only claim in this matter

An appropriate order is filed herewith.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE